CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 0 6 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| DAVID CANADA, ) | |
| Plaintiff, ) | Civil Action No. 7:07-cv-00421 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| SGT. BOOTH, et al., ) | By: Hon. James C. Turk |
| Defendants. ) | Senior United States District Judge |

Proceeding pro se, plaintiff David Canada brings this civil rights complaint pursuant to 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343. Plaintiff seeks monetary damages and injunctive relief for claims arising out of an incident on July 16, 2005, at the Lynchburg Adult Detention Center ("LADC"). The case is before the court on defendant Webb's motion to dismiss and defendant Boothe's[1] motion for summary judgment. Plaintiff responded to Webb's motion to dismiss on December 3, 2007. Booth filed a motion for summary judgment on December 7, 2007. The court notified plaintiff of defendant's motion for summary judgment as required by Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), and warned plaintiff that judgment might be granted for the defendant if he did not respond to the motion by filing affidavits or other documents contradicting the defendant's evidence or otherwise explaining his claims. Plaintiff has not responded and the underlying matter is now ripe for disposition.[2] For the reasons that follow, the court will grant defendants' motions.

---

[1] Plaintiff erroneously identified Boothe as "Booth" in the complaint.

[2] Plaintiff was granted additional time to respond to the motion for summary judgment when the court, by order entered January 8, 2008, granted his request to direct defendants to respond to plaintiff's interrogatories and document requests. Plaintiff was directed to file his response to the motion for summary judgment within sixty (60) days from the entry of the January 8, 2008 order. While defendants failed to provide the court with a copy of their answers and objections to plaintiff's interrogatories, a letter filed with the court on January 25, 2008, indicates that defendants complied with the court's order in a timely manner. Well over sixty (60) days have passed since the court's January 8, 2008 order; thus, this matter is ripe for disposition.

## I. Factual Summary

Plaintiff's complaint alleges an excessive force claim, in violation of the Eighth Amendment, against LADC Correctional Officer, Sergeant Lawrence W. Boothe, and Superintendent Christopher Webb, arising out of an incident on July 3, 2007, at approximately 9:15 AM. Specifically, plaintiff alleges that on that date he was being escorted by Boothe and two other unnamed officers from the medical department back to his cell. Plaintiff alleges that he "refused to enter his cell until he spoke with Sergeant Hughes" concerning an unspecified matter and that he then "laid face down on the floor." (Compl. at 3.) Plaintiff contends that Boothe subsequently sprayed plaintiff in the face with "chemical agents" and also called him a "smart ass nigga." (Compl. at 3.) Plaintiff alleges that Boothe and the two other officers then removed plaintiff from the floor and escorted him up the stairs to his cell. Once they reached the top of the steps and were out of view of any cameras, Boothe repeatedly "punched" plaintiff, "threw [him] up against the cell door," and again sprayed him in the face with "chemical agents." (Compl. at 3.) Plaintiff complains that he was in restraints during this incident and that he did not "show any aggressive behavior" necessitating such force. (Compl. at 3.) Plaintiff further complains that he was not "decontaminated" until the following day and that he "has not been seen by medical although he's made numerous requests to be seen concerning the injuries."[3]

---

[3] To the extent that plaintiff is attempting to support a claim of deliberate indifference to his allegedly serious medical needs against the LADC medical staff, the court notes that plaintiff fails to allege personal involvement by any named defendant. Plaintiff does not allege that Boothe or Webb were responsible for or prevented his medical treatment in any way and does not provide the court with the names of any medical or supervisory staff that may have prevented him from receiving medical care. A complaint that lacks specific factual allegations concerning a defendant's personal involvement should be dismissed. Liffiton v. Keuker, 850 F.2d 73, 76 (2d Cir. 1988). Accordingly, a deliberate indifference claim will not be considered by the court at this time. Plaintiff is advised that, if he wishes to pursue such a claim, he may do so in another civil rights complaint filed pursuant to 42 U.S.C. § 1983. Regardless, such a claim appears to lack merit as the evidence indicates that plaintiff was given the opportunity to decontaminate in the shower immediately after the incident, but he refused. Moreover, his cell had a sink with running water and he was encouraged to wash his eyes and face after he refused a shower and his contaminated jumper was replaced with a clean jumper. Furthermore, plaintiff was assessed by medical staff on three separate occasions. Medical records reveal that plaintiff indicated during those assessments that he
(continued...)

(Compl. at 4.) Plaintiff contends that immediately subsequent to the incident he suffered from a "swole [sic] eye" and "injured finger" and that he currently suffers from blurred vision, loss of sight, continued unspecified pain, and a scarred finger. (Compl. at 3.) Plaintiff provides the court with two notarized statements of other inmates supporting his version of events.

Defendant Boothe contends that he and the officers accompanying him acted in a professional manner during the incident on July 3, 2007, and used only necessary force against plaintiff. According to Boothe's affidavit submitted with the motion for summary judgment, on the morning of July 3, 2007, at approximately 9:00 AM, Booth encountered plaintiff and Correctional Officer Steven Souza while Souza was in the process of escorting plaintiff from the medical department back to his cell in Housing Unit I.[4] Boothe contends that he overheard plaintiff inform Souza that he was not going to return to his cell unless he was able to speak with Sergeant Jonathan Hughes immediately. Souza and Boothe informed plaintiff that they would inform Hughes of plaintiff's desire to speak with him, but cautioned plaintiff that he was going to have to return to his cell. Because of plaintiff's threat to refuse to return to his cell, Boothe became concerned about the possibility of a disturbance or altercation and decided to accompany Souza and plaintiff to Housing Unit I.

Upon arrival at Housing Unit I, plaintiff, Souza, and Boothe entered the "day room," a secure common area of the unit. (Boothe's Mot. Summ. J., Ex. 2 at 3.) Adjacent to the day room is the "rec

---

[3](...continued)
was "fine" and "alright," statements that plaintiff does not contest, and the medical staff observed and addressed only a few minor injuries. Finally, plaintiff provides no proof of causation as to his alleged injuries, including blurred vision and loss of sight. Thus, based on the current evidence before the court, any claim for deliberate indifference to an allegedly serious medical submitted by plaintiff is unlikely to succeed.

[4] Souza's affidavit was also submitted with the motion for summary judgment and supports Boothe's version of events.

3

yard," a secure courtyard. (Boothe's Mot. Summ. J., Ex. 2 at 3.) Subsequent to entering the day room, plaintiff stopped walking and refused to return to his cell until he was allowed to speak to Hughes. Souza requested additional assistance from Correctional Officer William Shumate, Jr., the officer working in the Control Room for Housing Units I and J at that time.[5] Booth requested several times that plaintiff return to his cell, but plaintiff refused to comply. Boothe then gave plaintiff a direct order to return to his cell and warned plaintiff that, in the event he refused, Boothe would contaminate plaintiff with O.C. spray.[6] Plaintiff responded by laying face down on the day room floor and yelled, "If you spray me, I'll sue!" (Boothe's Mot. Summ. J., Ex. 2 at 3.) Souza, Shumate, and Boothe then bent down to attempt to lift plaintiff off of the floor but he resisted their efforts and yelled, "You better get your hands off me!" (Boothe's Mot. Summ. J., Ex. 2 at 3.) At that point, Booth contaminated plaintiff with O.C. spray. Boothe notes that the officers were then able to regain control of plaintiff.

The officers then ushered plaintiff up the stairs to the mezzanine of Housing Unit I, where plaintiff's cell was located. Boothe alleges that plaintiff was "hostile and combative," and that he continued to "struggle and physically resist" the officers' efforts to move him up the stairs. (Boothe's Mot. Summ. J., Ex. 2 at 4.) Boothe claims that when they arrived at the top of the stairs, plaintiff "continued to struggle and spun away" from the officers. (Boothe's Mot. Summ. J., Ex. 2 at 4.) Shumate, by affidavit, contends that plaintiff then "turned toward [the officers], swinging both his hands, which were handcuffed in front of him." (Boothe's Mot. Summ. J., Ex. 5 at 3.) Boothe determined that a second burst of O.C. spray was necessary to regain control of the situation.

---

[5] Shumate's affidavit was also submitted with the motion for summary judgment and supports Boothe's version of events.

[6] "O.C." is an abbreviation for "oleoresin capsicum." O.C. spray is also known as pepper spray or mace.

4

Accordingly, Boothe contaminated plaintiff a second time with O.C. spray and plaintiff was secured inside his cell. Boothe denies that he punched or delivered any type of intentional blow to plaintiff and denies that he threw plaintiff against any cell door. He further denies that he made any of the alleged inappropriate statements.

Moments later, Sergeant Jonathan Hughes, Shift Leader, arrived along with several other correctional officers, and began speaking to plaintiff in an effort to calm him. Hughes, by affidavit, contends that he directed several officers to escort plaintiff to the shower stall located on the mezzanine of Housing Unit I so that plaintiff could decontaminate from the O.C. spray. Once in the shower, plaintiff declined to use the shower. Accordingly, he was returned to his cell. Hughes then directed plaintiff to wash his eyes and face at the sink located inside his cell. When plaintiff calmed down to an acceptable level, Hughes instructed Boothe to remove plaintiff's handcuffs. Plaintiff's contaminated jumper was removed from his cell so that he could be issued a clean jumper. Hughes alleges that, when he was present in plaintiff's cell following the incident, he never heard plaintiff complain that Boothe had punched him, called him a racially degrading name, or thrown him against a cell door during the incident.

Ruth C. Lewis, a LADC emergency medical technician ("EMT"), arrived at plaintiff's cell at 9:25 AM to assess plaintiff. Lewis, by affidavit, contends that, during her assessment, plaintiff was alert, oriented, and breathing at a normal rate. Plaintiff refused an in-depth physical examination and stated several times that he was "fine" and "alright." (Boothe's Mot. Summ. J., Ex. 7 at 2.) Lewis noted that plaintiff had been given the opportunity to shower prior to her arrival and, as she did not see any signs of obvious injury and plaintiff did not appear to be in any pain, Lewis determined that no medical treatment was required. Lewis contends that plaintiff never reported to her that he had been punched or thrown against a cell door by Boothe or any other officer. Lewis did not observe

5

any physical indications that plaintiff had been punched or thrown against a cell door.

Approximately ten minutes after his assessment by Lewis, plaintiff began to complain about a cut on his finger and pain and swelling in his hand. Anthony Iovinetti, LADC EMT, by affidavit, states that on the morning of July 3, 2007, he was asked to assess plaintiff for complaints of pain in his left middle finger. During his assessment, Iovinetti noted that plaintiff's left middle finger was slightly swollen and had a mild abrasion. Iovinetti cleaned, applied a bandage to the abrasion, and then "buddy-taped" plaintiff's middle finger to his index finger. (Boothe's Mot. Summ. J., Ex. 8 at 2.) Iovinetti also applied an ice pack to help reduce the swelling and instructed plaintiff to take Tylenol for his finger pain. Iovinetti left a note for the evening shift to follow up with plaintiff. Iovinetti contends that plaintiff never reported to him that he had been punched or thrown against a cell door by Boothe or any other officer. Iovinetti did not observe any physical indications that plaintiff had been punched or thrown against a cell door.

Valkyrie Troy, LADC licensed practical nurse ("LPN"), by affidavit, indicates that on the evening of July 3, 2007, at approximately 8:15 PM, she assessed plaintiff. Plaintiff complained of pain in his left middle finger and left eye. Troy observed that plaintiff's left eye was red and swollen from contamination with the O.C. spray. Troy did not observe any swelling in plaintiff's left middle finger and noted that the fingers of his left hand were the same temperature as the fingers of his right hand. Troy applied another ice pack and dispensed to plaintiff the Motrin that had previously been prescribed by the LADC physician for an unrelated medical condition. Troy contends that plaintiff never reported to her that he had been punched or thrown against a cell door by Boothe or any other officer. Troy did not observe any physical indications that plaintiff had been punched or thrown against a cell door. Troy contends that the redness and swelling that she observed in plaintiff's left eye were consistent with his history of having been exposed to O.C. spray earlier in the day. On July

5, 2007, Troy again assessed plaintiff, who complained of heartburn and swelling in his left middle finger. Troy observed minor swelling at the base of plaintiff's left middle finger. Accordingly, Troy provided plaintiff with an ice pack to reduce the swelling.

Boothe also provides evidence in the form of an affidavit from Joseph Hamlet, an inmate incarcerated at LADC, in support of his motion for summary judgment. Hamlet alleges that on July 3, 2007, at approximately 9:15 AM, he was sitting in the day room of Housing Unit I, reading a newspaper. Hamlet was instructed by an officer in the control room to step into the rec yard so that plaintiff could be brought into the day room and escorted upstairs. The wall separating the rec yard and the day room has several large windows which enable an individual standing in the rec yard to see into Housing Unit I. Hamlet entered the rec yard as instructed and stood in front of one of the aforementioned windows, looking into the day room. Hamlet contends that, from that position, he had a clear view of the day room as well as the cells located in Housing Unit I, including cell number 13, which was plaintiff's cell at that time. Hamlet also contends that he was able to hear the events going on inside Housing Unit I. Hamlet observed plaintiff, escorted by two officers, enter the day room and demand to speak to a "white shirt," stating that "he would not going into his cell until he had done so." (Boothe's Mot. Summ. J., Ex. 4 at 2.) The officers informed plaintiff that they would get a "white shirt" for him after he was in his cell. Plaintiff again refused to enter his cell and then laid down on the day room floor. Hamlet alleges that "one of the officers" requested "about ten times" that plaintiff enter his cell, but plaintiff refused. Hamlet also alleges that he heard the same correctional officer warn plaintiff that "if he did not get up and go to his cell, he would be sprayed with a chemical agent." (Boothe's Mot. Summ. J., Ex. 4 at 2.) Plaintiff again refused. A third correctional officer entered the day room and the three officers attempted to pick up plaintiff from the floor. Plaintiff began to "resist and struggle with the officers" and one of the officers

7

subsequently sprayed him with a chemical agent. (Boothe's Mot. Summ. J., Ex. 4 at 3.) The officers then lifted plaintiff to his feet and began to move him up the stairs to his cell. Plaintiff "continued to struggle and resist as the correctional officers moved him up the stairs and, eventually, to his cell." (Boothe's Mot. Summ. J., Ex. 4 at 3.) After plaintiff was secured in his cell, he continued to "yell angrily at the correctional officers and beat on his cell door." (Boothe's Mot. Summ. J., Ex. 4 at 2.) Eventually, Hamlet alleges that plaintiff calmed down and was allowed to go to the shower on the mezzanine. Approximately fifteen minutes later, Hamlet observed a "female nurse from the medical department" enter plaintiff's cell. Hamlet contends that he never observed any of the correctional officers punch plaintiff, throw him against a cell door, or call him racially degrading names.[7]

As a result of the incident, Boothe completed a Major Offense Report, charging plaintiff with a major violation for disobeying a direct order to return to his cell. A "major violation" is defined in the LADC inmate handbook as a "[r]ule infraction that threatens the security of the facility, the safety of the staff, public, and other inmates." (Boothe's Mot. Summ. J., Ex. 1(A) at 2.) Hughes made plaintiff a penalty offer of five days disciplinary segregation for the infraction, which plaintiff initially refused. On July 5, 2007, plaintiff accepted the penalty offer, which is "tantamount to a plea of 'guilty' to the infraction." (Boothe's Mot. Summ. J., Ex. 10 at 2.) Plaintiff's written plea was accepted by Clarence Magruder, the LADC hearing officers assigned to plaintiff's case.

---

[7] Plaintiff submitted with his complaint a notarized statement from Hamlet stating that the "officers mased [sic] [plaintiff] and swung on him and ruffed [sic] him up . . . and threw him against a couple [of] cell doors." (Compl. at 7.) However, Hamlet contends that this is not an accurate account of what he actually observed on July 3, 2007. Hamlet states that plaintiff approached him several days after the July 3, 2007 incident and asked Hamlet to write out a statement of what he has observed. Hamlet wrote a statement but plaintiff told him that "it wasn't good enough" and demanded that he write another. (Boothe's Mot. Summ. J., Ex. 4 at 4.) Hamlet alleges that plaintiff told Hamlet what to write in the statement and harassed Hamlet until Hamlet wrote a statement as requested.

8

## II. Motion to Dismiss

Superintendent Christopher Webb contends that the motion to dismiss must be granted because (1) plaintiff's complaint fails to state a claim upon which relief can be granted; and (2) plaintiff failed to file an amended complaint as directed. In considering a motion to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). However, a court "need not accept the legal conclusions drawn from the facts," and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000). Additionally, the complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974.

Plaintiff includes Webb as a defendant for "hiring and not over sees [sic] to make sure his staff [do not] harm inmates in brutal manners, and allowing such [a] policy to go uncorrected." (Compl. at 4.) Pursuant to the conditional filing order entered September 6, 2007, the court informed plaintiff that his complaint failed to state a claim against Webb and directed plaintiff to amend his allegations. Plaintiff failed to do so. Accordingly, as plaintiff failed to comply with the court's order and correct the noted deficiencies, his claim against Webb must be dismissed.

Regardless, to the extent plaintiff asserts Webb is liable under a theory of supervisory liability, such a claim is without merit. Supervisory officials may be held liable for the actions of their subordinates only if the plaintiff can show: (1) that the supervisor had actual or constructive

9

knowledge that subordinates were engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) there was an "affirmative causal link" between the supervisor's inaction and the actual constitutional injury suffered by the plaintiff. Randall v. Prince George's County, Md., 302 F.3d 188, 206 (4th Cir. 2002) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations omitted)); Slakan v. Porter, 737 F.2d 368 (4th Cir. 1984).

Plaintiff fails to allege any facts which suggest that LADC officers pervasively conducted the kind of actions alleged in his complaint or that Webb was aware of any alleged misconduct. Plaintiff does not assert that prior to the incident on July 3, 2007, he had ever been the victim of excessive force or that he had filed any complaints against Boothe for any alleged incidents of excessive force or misconduct. Nor does plaintiff provide sufficient facts to support his conclusory assertion that Webb implemented or condoned a policy of excessive force by any of the LADC correctional officers. Thus, plaintiff cannot demonstrate that Webb had actual or constructive knowledge of any violations of plaintiff's constitutional rights before the alleged incident or that he instituted a policy likely to result in the constitutional harm alleged. See Davis v. Lester, 156 F. Supp. 2d 588, 597 (W.D. Va. 2001) (finding that supervisory officials cannot be held liable for subordinates' conduct when they did not have specific notice of any risk of harm to that particular inmate prior to the alleged violation and they had not effectuated or condoned any policy likely to result in the harm alleged). Thus, the court finds that any claim of supervisory liability fails. Accordingly, for all of the stated reasons, Webb's motion to dismiss must be granted.

### III. Motion for Summary Judgment

Sergeant Lawrence W. Boothe contends that no genuine issue of material fact remains to be

10

decided by a trier of fact concerning this action and, therefore, requests that the court grant summary judgment in his favor. Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Fed. R. Civ. P. 56(e). Instead, the non-moving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. Anderson, 477 U.S. at at 256-57.

### A. Excessive Force Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). As previously stated, plaintiff alleges that Boothe used excessive force against him on July 3, 2007, in violation of the Eighth Amendment's prohibition against the infliction of cruel and unusual punishment. The Eighth Amendment protects individuals against excessive prison

11

sentences, as well as inhumane treatment and excessive force while imprisoned. See U.S. Const. amend. VIII. To prevail on an excessive force claim, an inmate must establish that prison officials acted with a sufficiently culpable state of mind, and that the harm inflicted on the inmate was sufficiently serious. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Although there is no requirement that an inmate suffer "serious" or "significant" pain or injury to demonstrate that his harm rises to the level of a constitutional violation, a plaintiff must allege "more than a de minimis pain or injury." Norman v. Taylor, 25 F.3d 1259, 1263 n. 4 (4th Cir. 1994).[8] An inmate must also satisfy a subjective component by showing that the force was applied "maliciously and sadistically for the purpose of causing harm" and not "in a good faith effort to maintain or restore discipline." Whitley v. Albers, 475 U.S. 312, 320-21 (1986); see also Williams, 77 F.3d at 761. Further, not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citing Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).

The court has reviewed the relevant video recording of the day room in Housing Unit I on the date and time in question and the affidavit evidence submitted by both parties and it is clear that plaintiff has failed to meet the subjective component of an excessive force claim. The record reflects that Boothe gave plaintiff numerous opportunities to comply with his orders prior to Boothe's resort

---

[8] In Norman, the United States Court of Appeals for the Fourth Circuit recognized that "there may be highly unusual circumstances in which a particular application of force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in the impermissible infliction of pain." Norman, 25 F.3d at 1263. In such circumstances, "the force will be 'of a sort repugnant to the conscience of mankind,' and thus expressly outside the de minimis force exception, or the pain itself will be such that it can properly be said to constitute more than de minimis injury." Id. (quoting Hudson, 503 U.S. at 8). In other words, the inmate must show, objectively, that the use of force was contrary to contemporary standards of decency and that he suffered more than de minimis pain or injury. See Hudson, 503 U.S. at 7, 9. Inasmuch as some abuses can leave no lasting physical evidence of injury, the courts recognize that "the objective component can be met by 'the pain itself,' even if the inmate suffers no 'enduring injury.'" Williams, 77 F.3d at 762 (quoting Norman, 25 F.3d 1259, 1264 n. 4).

12

to force. Boothe requested that plaintiff proceed to his cell on several occasions, gave plaintiff a direct order to enter his cell, and warned plaintiff that if he did not follow the direct order, he would be contaminated with O.C. spray. Plaintiff himself admits that he refused to enter his cell and, instead of complying with a direct order, chose to lay down on the floor in protest. Accordingly, the court finds that Sergeant Boothe did not act maliciously in response to plaintiff's refusal to enter his cell. See Hicks v. Simpkins, No. 7:06-cv-00463, 2006 WL 2303179, at *3 (W.D. Va. Aug. 09, 2006) (finding no excessive force where inmate was sprayed with pepper spray after twice disobeying a direct order to return to his cell); Miles v. Murra No. Civ.A. H-05-2831, 2006 WL 456269, at *4 (S. D. Tex. Feb. 23, 2006) (finding no excessive force and noting that officer used pepper spray, a chokehold, push to the chest, and a knee to the back to restore order and discipline after the inmate requested to speak with officer's supervisor and refused officer's commands to return to his cell and face the wall); see also Hart v. Celaya, No. C 06-02519 CW (PR), 2008 WL 1734845, at * 8 (N.D. Cal. Apr. 11, 2008) (finding no excessive force where inmate was sprayed with O.C. spray after inmate refused to submit to a strip search and requested an audience with a higher prison official, officers gave him direct orders to submit to the search and warned him that he would be subjected to O.C. spray if he did not comply); Fischer v. Ellegood, No. 2:03-cv-453-FtM-99DNF, 2006 WL 2425421, at *6 (M.D. Fla. Aug. 21, 2006) (finding no excessive force where inmates were sprayed with O.C. spray after refusing to follow orders to face their cell wall during a shakedown).

Moreover, the video recording clearly shows that when the officers attempted to pick plaintiff up from the floor he began to struggle with them. Plaintiff is a very large man[9] and three officers were required to remove him from the floor of the day room and to escort him up the stairs. It is clear

---

[9] According to the affidavit of Raymond Espinoza, LADC Site Administrator, Canada was processed at the LADC on May 30, 2007 and, at that time, he stood six (6) feet, five (5) inches tall and weighed two hundred and twenty (220) pounds. The video recording reveals that plaintiff towered over the guards escorting him.

13

that plaintiff struggled against and resisted the officers all the way up the stairs. Thus, the court finds that the second contamination of O.C. spray, even though ultimately out of the view of the camera, was not malicious or a wanton use of force. It is unlikely that plaintiff immediately became cooperative the moment that he was out of view of the day room camera, nor does plaintiff allege such a sequence of events. Additionally, the court notes that plaintiff pleaded guilty to a major disciplinary charge, the very definition of which "threaten[ed] the security of the facility," for the conduct that led to the incident, which demonstrates the need for force to be applied to plaintiff. (Boothe's Mot. Summ. J., Ex. 1(A) at 2.)

The court further finds that plaintiff fails to dispute Boothe's clear evidence presented in conjunction with his motion for summary judgment. Plaintiff contends in his original complaint that he did not "show any aggressive behavior to deserve the unnecessary and wanton infliction of pain." (Compl. at 3.) However, the unchallenged video recording belies plaintiff's contention. While plaintiff may not have originally been acting in an aggressive manner, he was certainly resisting and struggling with the officers from the time that they attempted to pick him up from the floor. Further, plaintiff fails to respond to Boothe's allegation that plaintiff was "hostile and combative" when the officers attempted to lift him off of the floor and bring him up the stairs, that when they arrived at the top of the stairs, plaintiff "continued to struggle," and that he swung his arms at the officers. (Boothe's Mot. Summ. J., Ex. 2 at 4.) Plaintiff also claims in his original complaint that Boothe punched him and slammed him against a cell door once they were on the mezzanine level of the Housing Unit I. Video surveillance is not available for that area of Housing Unit I; however, all of the officers involved in the incident and an inmate witness testify, through sworn affidavits, that Boothe did not punch plaintiff or slam him against a cell door. Moreover, the treating LADC medical staff indicate, through sworn affidavits, that plaintiff never informed them that such events occurred.

14

Boothe does not contest the validity of these statements. Finally, plaintiff's minor injuries, recorded in his medical records, are not consistent with plaintiff's version of events. Regardless, even if Boothe used physical force against plaintiff when they reached the mezzanine level, plaintiff fails to demonstrate that such force was not applied in a good faith effort to restore order. Accordingly, the court finds that plaintiff has failed to carry his burden of proof as to his excessive force claim.

For all of the stated reasons, the court finds that plaintiff fails to establish any genuine issue of material fact as to whether Sergeant Boothe made "a good faith effort to maintain or restore discipline" in accord with Whitley, 475 U.S. at 320, or whether his response was proportionate to plaintiff's refusals to comply and subsequent disruptive behavior. Thus, Boothe's motion for summary judgment must be granted as to plaintiff's excessive force claim.

### B. Racial Slur Claim

Plaintiff also claims that Boothe directed several racial slurs at him during the July 3, 2007 incident. Verbal harassment or verbal abuse of inmates by prison officials, without more, does not rise to the level of an Eighth Amendment violation. See Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979), cited with approval in, Moody v. Grove, No. 89-6650, 1989 WL 107004, at *1 (4th Cir. Sept. 19, 1989); see also Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (calling an inmate an obscene name did not violate constitutional rights); Keyes v. City of Albany, 594 F. Supp. 1147, 1155 (N.D.N.Y. 1984) ("[T]he use of vile and abusive language [including racial epithets], no matter how abhorrent or reprehensible, cannot form the basis for a 1983 claim."). Accordingly, plaintiff's allegation that Boothe directed racial slurs towards him during the July 3, 2007 incident is insufficient to state a constitutional violation and Boothe's motion for summary judgment must be granted as to this claim as well.

15

## IV. Conclusion

Based on the foregoing, the court will grant Webb's motion to dismiss and Boothe's motion for summary judgment.[10]

The Clerk is directed to send copies of this Memorandum Opinion and accompanying Order to plaintiff and to all counsel of record for defendants.

**ENTER:** This 6th day of May, 2008.

*/s/ James C. Turk*
Senior United States District Judge

---

[10] Plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within thirty (30) days of the date of entry of this Memorandum Opinion, or within such extended period as the court may grant pursuant to Rule 4(a)(5).